### SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,

v.

### C. R. RICHMOND & CO., and Curtis R. Richmond, Defendants-Appellants.

### No. 75–2384.

United States Court of Appeals,
Ninth Circuit.

Dec. 7, 1977.

---

Darrell L. Johnson, of Lindholm & Johnson, Los Angeles, Cal., and Nathan Markowitz, Beverly Hills, Cal., for defendants-appellants.

James H. Schropp, Washington, D. C., for plaintiff-appellee.

* The Honorable William J. Lindberg, Senior United States District Judge, Seattle, Washington, sitting by designation.

1. Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6, provides in pertinent part:

> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . .
> (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

Before ELY and CHAMBERS, Circuit Judges, and LINDBERG,* District Judge.

LINDBERG, District Judge:

Appellant C. R. Richmond and Company is registered as an investment adviser with the Security and Exchange Commission. The District Court, sitting without a jury, enjoined him from publishing a book which explains his services, describes a method of investment and its success rate, and implies that great profits will result. The District Court found this activity in violation of § 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6, and Rule 206(4)–1, 17 C.F.R. 275.206(4)–1, promulgated thereunder.[1]

I

The original complaint against appellants contained eight counts, seven of which were resolved by stipulation prior to trial. Richmond and Company was registered as an investment adviser beginning on June 19, 1971. Mr. Richmond, the president and sole shareholder, has controlled and supervised the operations of his company since its incorporation. His activities as an investment adviser primarily involved the management of clients' securities accounts for a fee, through two offered programs, the Mutual Fund Program and the Individual Stock Program. The former was the more

Rule 206(4)–1, 17 C.F.R. 275.206(4)–1, promulgated thereunder, defines certain advertising practices as fraudulent, deceptive or manipulative. It defines as such the circulation or distribution of any advertisement which:
(1) refers to past specific recommendations of the investment adviser which were or would have been profitable to any person, unless the advertisement also sets forth, in the manner specified in the rule, a list of all recommendations made during the immediately preceding period of not less than 1 year;
(2) represents that any graph, chart, formula or other device can assist any person in making his own investment decisions without prominently disclosing the limitations with respect to their use;
(3) contains any untrue statement of a material fact, or which is otherwise false or misleading.

popular and the one primarily recommended by Mr. Richmond.

In October, 1972, Richmond and Company published a book, *The Money Machine*, which Mr. Richmond had authored and which described his investment philosophy and techniques. The book was provided to those who attended his $35 seminars, advertised in several newspapers along with announcements of his seminars, and also sold to the general public. He also published a weekly market letter, "the Richmond Outlook", which typically contained several pages of Mr. Richmond's analysis of the market, recommendations with respect to the stock of selected corporations, and a description of transactions in a Model Portfolio. In addition, Richmond and Company placed several advertisements in newspapers promotion investment seminars to be held by Mr. Richmond. The SEC challenged these activities, contending that *The Money Machine*, "The Richmond Outlook", and the newspaper advertisements for the seminars were all advertisements that violated § 206 of the Investment Advisers Act of 1940 and Rule 206(4)-1.

### II

The issues raised on appeal are whether the trial court erred in classifying appellant's book and newsletter as an "advertisement" in violation of 17 C.F.R. 275.206(4)-1(b), and whether the materials contained therein violated the antifraud provisions of the Investment Advisers Act, 15 U.S.C. § 80b-6 and 17 C.F.R. 275.206(4)-1.

### III

On review, the test to be applied is whether the findings of the trial court were "clearly erroneous." Fed.R.Civ.P. 52(a). In this circuit's decision in *Smith v. James Irvine Foundation*, 402 F.2d 772, 774 (9th Cir. 1968), *cert. denied*, 394 U.S. 1000, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969), the court observed that

> a finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. (Citations omitted) And it is now settled that . . . we are not to retry the issues of fact nor to supplant the district court's judgment with that of our own.

With that standard in mind, it is necessary to review the findings and determine whether there is evidence to support them.

### IV

The term "advertisement" is broadly defined in Rule 206(4)-1(b),[2] and conduct with respect to these rules must be measured from the viewpoint of a person unskilled and unsophisticated in investment matters. *Spear & Staff, Inc.*, 42 S.E.C. 549, Fed.Sec.L.Rep. (CCH) ¶ 77,216 (1965). Mr. Richmond's book, *The Money Machine*, purports to be his analysis of the securities market. The jacket cover proclaims "Richmond's Book Details How To Multiply Your Investment 50 Times"; the inside jacket note indicates that "he explains in simple fashion how anyone can utilize his theory, and follow his path to investment success". It describes a "chart, formula or device", the 39-Week Moving Average of the Dow Jones Industrial Average; it indicates that the investor must have a "philosophy and discipline that can make money during these long, sideways shuffles [periods between bull and bear markets]" and states that Mr. Richmond's "7-year record" has achieved this. The concluding chapter describes Richmond's weekly newsletter as containing further information and analysis and the company's address is set forth prominently on the title page of the book.

---

2. For the purposes of this section the term "advertisement" shall include any notice, circular, letter or other written communication addressed to more than one person, or any notice or other announcement in any publication or by radio or television, which offers (1) any analysis, report, or publication concerning securities, or which is to be used in making any determination as to when to buy or sell any security, or which security to buy or sell, or (2) any graph, chart, formula, or other device to be used in making any determination as to when to buy or sell any security, or which security to buy or sell, or (3) any other investment advisory service with regard to securities.

██ Investment advisory material which promotes advisory services for the purpose of inducing potential clients to subscribe to those services is advertising material within the Rule. *Paul K. Peers, Inc.*, 42 S.E.C. 539, 540–41 (1965). It is clear from the record that there was sufficient evidence to conclude that the book and newsletter were advertisements within the meaning of Rule 206(4)–1(b).

██ Appellants also argue that the district court erroneously concluded that their book, *The Money Machine*, and market letter, "The Richmond Outlook", violate the antifraud provisions of § 206 of the Investment Advisers Act of 1940 and Rule 206(4)–1(a). Section 206 prohibits an investment advisor from engaging "in any act, practice, or course of business which is fraudulent, deceptive or manipulative." The statute authorized the Commission to issue rules describing acts which violate § 206. Pursuant to that authority, the Commission promulgated Rule 206(4)–1. Under that Rule, advertisements (1) that refer to specific past recommendations without listing all recommendations of the past year, (2) that suggest that any graph, chart, formula, or other device can assist in making decisions concerning securities without prominently disclosing the limitations of the device, or (3) that contain untrue, false or misleading statements are violations of § 206. As noted, conduct with respect to these rules is to be measured from the viewpoint of a person unskilled and unsophisticated in investment matters, *see Marketline, Inc. v. SEC*, 384 F.2d 264, 266 (2d Cir. 1967); *Spear & Staff, Inc.*, 42 S.E.C. 549, 543–44 (1965), and the terms "fraud" and "deceit" are used in a flexible and non-technical sense to effectuate the Act's remedial purposes. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). The court there also held that the Commission does not have to show, in injunctive actions, that an investment adviser's activities injured his clients or were intended to harm clients or prospective clients. *Id.* at 195, 84 S.Ct. 275. The district court found

that *The Money Machine* and "The Richmond Outlook" violated all three of the subparts of Rule 206(4)–1 mentioned above. We now briefly review the evidence in support of those findings.

*The Money Machine* repeatedly represents that the 39–Week Moving Average can be used in and of itself to determine when to buy and sell shares of mutual funds:

"In reviewing this chart [showing the 39–Week Moving Average] for the previous 7 years, I discovered the almost infallibility of this simple, mechanical, trend-following tool." *TMM* at 17.**

"[Knowing which way the market is going] is best demonstrated by the 39–Week Moving Average . . . . This highly accurate indicator has been wrong only once in 19 years . . . . It is a very simple indicator to both construct and follow." *TMM* at 35.

"If an investor would use one of these moving averages religiously, he would guarantee himself large profits." *TMM* at 80.

"[T]he simplest and most predictable way of determining which trend is in force is the all-important 39–Week Moving Average. This indicator is as near perfect as anything can be in the stock market." *TMM* at 113.

"If one were to use the 39–Week Moving Average mechanically, without thinking, and were to use almost any mutual fund, he would outperform these highly paid and distinguished portfolio managers, with all of their expertise." *TMM* at 127.

This average is charted on the first page of each issue of "The Richmond Outlook". Although Richmond does offer some limited cautionary warnings about the use of the average, they are surrounded by statements indicating that the limitations can be overcome by the use of Richmond's methods and, like the cautionary warnings found insufficient in *Spear & Staff, Inc., supra* at 554, the warnings are not sufficiently prominent so that "the numerous uncertainties

---

** *TMM* refers throughout to *The Money Machine*.

and imponderables inherent in any attempt to forecast securities prices" are both minimized and obscured. Appellants have offered no substantial evidence indicating that the court's findings in this respect were "clearly erroneous."

Specific past recommendations are included throughout *The Money Machine* without offering a complete list of recommendations made during the preceding year as required by Rule 206(4)–1(a)(2). *Paul K. Peers, Inc., supra* at 541. Such recommendations also appear in "The Richmond Outlook", particularly in the Model Portfolio, a regular feature that describes transactions in various stocks.

The court below found that the appellants advertised in a manner which led clients and prospective clients to believe that the use of Richmond's services would lead to imminent and sizable profits with minimum risks.[3] In reviewing the evidence, newspaper advertisements referred to the "90 percent predictable approach—minimum risks". *The Money Machine* referred to Richmond's ability to predict the market:

> "The only problem, then is to pick one of the better funds, but even if a mediocre fund is selected, a profit will still be realized." *TMM* at 20.

> "I follow the philosophy that the market is predictable most of the time, but not all of the time. By trying to invest with the major trend of the market, I will be right most of the time. The times that I am wrong, I will lose only opportunity by being out of the market, not money." *TMM* at 72.

Both the book and the newsletter described the hypothetical performance of the Model Portfolio as having been highly profitable and implied that Richmond had access to material inside information. Contrary to the Rule's requirements, it was never disclosed in the publications that the transactions of the Model Portfolio were hypothetical and in fact never occurred. *Killgore Management, Inc.,* [1972–1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 78,977 (S.E. C.1972). The comparison of the "performance" of the Model Portfolio to the Dow Jones Industrial Average was also misleading, because each is based upon different factors which were not disclosed. *Killgore Management, Inc., supra.*[4] The examples of successful use of Richmond's techniques were given in the book and newsletter without disclosing that the examples were hypothetical or used unlawful borrowing techniques.[5]

■ Finally, Richmond maintains that every sentence used throughout the course of his advertising in and of itself is accurate and truthful. But in *Spear & Staff, Inc., supra,* just such a claim was rejected when the court noted that the advertisements

---

**3.** In *Marketline, Inc. v. SEC,* 384 F.2d 264 (2d Cir. 1967), the court held that it was not improper to judge advertisements of an investment adviser by their impact on the segment of the public at which they were aimed. "[T]he Commission could properly conclude that the entire content and tone of the advertisements was designed to whet the appetite of the unsophisticated." *Id.* at 266.

**4.** In *Killgore Management, Inc.,* tables and grabs compared the KMI Index with other indices without pointing out the material differences between them. Such conduct, the court found, was clearly misleading and fraudulent under the rules. While the Model Portfolio in this instance is a managed account, the Dow Jones Industrial Average is not and is always comprised of the same fixed group of securities. Furthermore, the Model Portfolio frequently engaged in short sales, a device not available to the Dow Jones Industrial Average.

Finally, the Model Portfolio was increased by dividends received from stocks which were supposedly in the portfolio, while the Dow Jones Industrial Average does not increase when dividends are paid.

**5.** In Chapter VII of *The Money Machine,* entitled "Margining for Riches", Richmond describes in detail how the use of 33⅓%, 50% and 66⅔% margin in connection with his transactions would have increased the profit of an initial $10,000 investment from $138,000 to $1,224,860, $2,033,268 and $3,314,327, respectively. The chapter also contains a reference to an investor who used Richmond's techniques and turned $230,000 into $1,500,000 in thirteen months. Elsewhere, he suggests that bankers can be found who "will look the other way" on allowing margins beyond the authorized limits. No place does he disclose that the examples used involved the use of illegal margins.

were "deceptive and misleading *in their overall effect* even though when narrowly and literally read, no single statement of a material fact was false."[6]

Nothing presented on this appeal demonstrates that a different result should be reached here.

### V

■ Appellants' claim that their rights under the First Amendment have been violated is without merit. *SEC v. Wall St. Transcript Corp.*, 422 F.2d 1371, 1379 (2d Cir. 1970). Appellants admitted that they were subject to the Investment Advisers Act by their registration thereunder.

### VI

Appellants have failed to show any Finding of Fact or Conclusion of Law of the trial court to be "clearly erroneous."

Affirmed.